## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Jazmine Harris,

        Plaintiff,

                Case No. 1:22-cv-2456-MLB

v.

Public Broadcasting Service,

        Defendant.

_____/

## OPINION & ORDER

Plaintiff Jazmine Harris sues Public Broadcasting Service for violations of the Video Privacy Protection Act. Defendant moves to dismiss, for leave to file and respond to notices of supplemental authority, and to disregard Plaintiff's response. (Dkts. 12, 23, 27, 29, 30, 33.) The Court grants Defendant's motions for leave to file and respond but denies its motion to dismiss and to disregard.

## I.    Background

Defendant Public Broadcasting Service ("PBS") operates the Pbs.org webpage. (Dkt. 1 ¶ 21.) Plaintiff Jazmine Harris signed up for a free account with Pbs.org, which required her to provide Defendant her

name, email address, zip code, IP address, and any cookies associated with her device.  (Dkt. 1 ¶¶ 20, 46.)  As an account holder, Plaintiff receives emails and other news from Pbs.org.  (Dkt. 1 ¶ 46.)  Since creating her account, she has used Pbs.org to watch videos while being simultaneously logged into her Facebook account.  (Dkt. 1 ¶ 12.)

An "invisible" tool called the Facebook tracking pixel allows Facebook to monitor its users' activity on third-party websites and customize ads for each user's feed.  (Dkt. 1 ¶ ¶¶ 30-31.)  Plaintiff alleges Defendant installed the Facebook tracking pixel on Pbs.org.  (Dkt. 1 ¶ 32.)  She claims that, when an account holder logs into his or her PBS account to watch videos, Defendant uses the tracking pixel to track the user's activity and send information about that activity to Facebook, including the name of the video the account holder watched, the video's URL, and the account holder's unique Facebook ID ("FID").  (Dkt. 1 ¶ 32.)  Defendant configured its website to cause this to happen because "it benefits financially by providing this highly sought-after information." (Dkt. 1 ¶ 42.)  It could easily configure its website so this does not happen. (Dkt. 1 ¶ 44.)  Defendant does all of this without the account holder's consent.  (Dkt. 1 ¶ 42.)  So, when Plaintiff logged into her PBS account to

watch videos, Defendant allegedly disclosed her personal viewing information to Facebook without her consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Plaintiff sued Defendant under the VPPA on behalf of herself and all others in the United States who had a digital subscription to Defendant's website and had their personal viewing information disclosed to Facebook as a result of Defendant's configuration of the website. (Dkt. 1 ¶ 50.)

## II.     Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This requires more than a "mere possibility of misconduct." *Id.* at 679. Plaintiff's well-pled allegations must "nudge[] [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.  Discussion

The VPPA generally prohibits "video tape service providers" from knowingly disclosing, to a third-party, "personally identifiable information concerning any consumer." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015); 18 U.S.C. § 2710(b).  Personally identifiable information includes information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  Defendant argues the Court should dismiss Plaintiff's claim because (a) Plaintiff is not a "consumer," (b) Defendant did not disclose "personally identifiable information," and (c) Defendant did not "knowingly" disclose any of Plaintiff's information.  (Dkt. 12-1 at 6-7.)

### A.    Whether Plaintiff is a Consumer Under the VPPA

Under the VPPA, "the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Ellis*, 803 F.3d at 1253; 18 U.S.C. § 2710(a)(1).  Plaintiff does not allege that she rented or purchased any goods from Defendant, so Plaintiff must allege she is a subscriber.   Defendant raises two arguments as to why Plaintiff is not a subscriber.  First, it says Plaintiff

has failed to allege the requisite "commitment, relationship, or association" to qualify as a subscriber under controlling precedent. (Dkt. 12-1 at 12.)  Second, it says, to the extent Plaintiff alleged a subscription, she did so to services that "are distinct and set apart from [Defendant's] provision of videos." (Dkt. 12-1 at 12.)

### 1.   Subscriber

The Eleventh Circuit has established a multi-factor test for determining whether someone is a subscriber under the VPPA, explaining that "subscriptions involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content." *Ellis*, 803 F.3d at 1256 (internal citation omitted).  No single factor is dispositive.  But, at its core, a subscription "involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Id.* at 1256.  The Eleventh Circuit's application of these factors in *Ellis* is helpful here.  In that case, the plaintiff downloaded a mobile app for the Cartoon Network and used it to watch free content.  *Id.* at 1257.  The Court of Appeals determined the plaintiff was not a subscriber because he had not established an account or profile with the Cartoon Network,

provided the Cartoon Network any personal information, paid the network any money, become a "registered user" of the network, received a user identification number from the network, signed up for any periodic services or transmissions, or made any commitment that would have given him access to exclusive or restricted content. *Id.* at 1257. The evidence showed the plaintiff simply watched video clips on his phone through a free app. *Id.* The Court of Appeals explained

> in our view, downloading an app for free and using it to view content at no cost is not enough to make a user of the app a "subscriber" under the VPPA, as there is no ongoing commitment or relationship between the user and the entity which owns and operates the app. Importantly, such a user is free to delete the app without consequences whenever he likes, and never access its content again. The downloading of an app, we think, is the equivalent of adding a particular website to one's Internet browser as a favorite, allowing quicker access to the website's content.

*Id.* In a subsequent case, the Eleventh Circuit added that a subscription to a network's content via a third-party, such as a cable television provider, does not convert a person into a subscriber of the network. *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342-43 (11th Cir. 2017).

Plaintiff here alleges a stronger "commitment or relationship" with Defendant than the relationships at issue in *Ellis* and *Perry*. Plaintiff

alleges she registered for a PBS account and provided Defendant her personal information, including her name, address, email, IP address and cookies. (Dkt. 1 ¶ 46.)  In return, Plaintiff received periodic newsletters and emails from Defendant. (Dkt. 1 ¶¶ 20, 46.)  She also claims she has had this relationship with Defendant since 2015. (Dkt. 1 ¶ 12.)  So, unlike in *Ellis*, Plaintiff "provided personal information" to Defendant, "established an account" with Defendant's webpage and received "periodic services" from Defendant.  It also appears Plaintiff got access to "restricted content" in the form of newsletters and email updates.  And, unlike in *Perry*, Plaintiff registered *directly with* Defendant, not with a third-party provider.

Of course, these differences do not necessarily mean Plaintiff is a "subscriber" under the VPPA.  In some respects, Plaintiff's relationship with PBS is like that in *Ellis* and *Perry*: Plaintiff never paid Defendant, did not make any commitment to Defendant, and was "free to delete [her PBS account] without consequences whenever [s]he like[d]."  However, *Ellis* convinces the Court that Plaintiff has sufficiently alleged she is a subscriber.  In finding that "subscription" does not require payment, the Eleventh Circuit explained "there are numerous periodicals, newsletters,

7

blogs, videos, and other services that a user can sign up for (i.e., subscribe to) and receive for free." *Ellis,* 803 F.3d at 125 (citing *In re Hulu Priv. Litig.*, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)).  So, the Eleventh Circuit specifically contemplated free newsletter subscriptions – like the one at issue here – when making its decision in *Ellis*.  The Court thus finds Plaintiff has sufficiently alleged she is a subscriber under the VPPA.[1]

This holding is also consistent with the court's recent decision in *Lebakken v. WebMD, LLC*, 2022 WL 16716151 (N.D. Ga. Nov. 4, 2022).  There, the plaintiff provided her email address and birth date to create an online account with WebMD.  *Id.* at *1.  In return, Plaintiff received periodic, free newsletters that often contained video content.  *Id.*  The plaintiff also used her account to view videos on WebMD's webpage.  *Id.*  Because "unlike in *Ellis* and *Perry*, [Plaintiff] allege[d] more than just the

---

[1] Additionally, that "payment is not a necessary element of subscription," *Ellis*, 803 F.3d at 1256, itself suggests Plaintiff has alleged enough.  Plaintiff did not pay for her PBS account and the accompanying newsletters, but her registration otherwise looked much like that for a paid service.  It appears evident that subscription to a paid streaming service (like Netflix) or a digital news outlet (like the New York Times) would render Plaintiff a "consumer" under the VPPA.  If payment is not required, then a free registration otherwise consistent with registration for those services would likely suffice.

free downloading of a mobile application onto her smartphone; she allege[d] that she exchanged her email address to receive the WebMD e-newsletter and that she also created her own WebMD account," the court found the plaintiff adequately pleaded she was a subscriber under the VPPA.  This Court agrees with that reasoning.[2]

---

[2] Plaintiff cites *In re Hulu Priv. Litig.*, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012), for the proposition that someone becomes a subscriber when the person visits a website and views videos regardless of whether the person was registered and logged into an account.  (Dkt. 19 at 8.)  The Eleventh Circuit has already rejected such a broad reading of the VPPA and has interpreted *Hulu* more narrowly.  *See Ellis*, 803 Ff.3d at 1257 ("The district court in *Hulu* denied the motion to dismiss because the plaintiffs did a lot more than just visit Hulu's website. They 'signed up for a Hulu account, became registered users, received a Hulu ID, established Hulu profiles, and used Hulu's video streaming services.'").  Plaintiff also cites *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016), which held a plaintiff had established a consumer relationship by downloading an app because he provided his Android ID and GPS coordinates when he viewed a video.  The Eleventh Circuit clearly requires more.  Indeed, the First Circuit in *Yershov* explicitly disagreed with some of the Eleventh Circuit's analysis in *Ellis*. *Id.* ("We would describe the allegations (and their reasonable inferences) in this case quite differently [than the Ellis Court].").  And, in *Ellis*, the Eleventh Circuit endorsed the district court's opinion in *Yershov*, which found those facts insufficient to state a consumer relationship under the VPPA.  *See Ellis*, 803 F.3d at 1256 (citing *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 147-48 (D. Mass. 2015)).  So, although this Court agrees Plaintiff has stated a consumer relationship, it does not agree with Plaintiff's analysis on these points.

## 2.    Video Versus Non-Video Services

Defendant argues "Plaintiff's alleged registration to receive free emails and other news from PBS.[org], is immaterial because such services are distinct and set apart from its provision of videos." (Dkt. 12-1 at 12.)  In other words, Defendant argues the VPPA requires a plaintiff to subscribe specifically to an entity's video services.  Subscribing to an entity's unrelated services (such as digital newsletters), Defendant says, is insufficient even if that entity also offers video services.  Plaintiff argues the VPPA requires a plaintiff to have a subscriber relationship with an entity, not its video services.  (Dkt. 19 at 9.)  Plaintiff also argues she has alleged "that her subscription gave her access to a variety of Defendant's video and audio media on Defendant's digital platform." (Dkt. 19 at 9.)

Whether an alleged subscription to non-video services is sufficient to state a claim under the VPPA is a question of first impression within the Eleventh Circuit.  Defendant cites *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662 (S.D.N.Y. 2015), to argue a subscription to an entity's non-video services is insufficient.  In that case, the plaintiff sought leave to amend her VPPA complaint to allege she "registered for

[the] television network's newsletter as it relates to the Walking Dead TV show, providing certain personal information, including her email address, and that she subsequently received promotional emails regarding the show, including a link to unsubscribe should she choose to do so." *Id.* at 671. The Court, while allowing the plaintiff an opportunity to amend, expressed skepticism about "whether a plaintiff can constitute a subscriber under the VPPA if she subscribes only to a portion of the provider's services that are distinct and set apart from its provision of videos." *Id.*

The court in *Austin-Spearman* never reached a decision on the issue. Its skepticism also is not binding. The plain text of the VPPA defines "consumer" as "any renter, purchaser, or subscriber *of goods or services* from a video tape service provider." So, at first glance, the VPPA requires only a subscription to *any* goods or services, not to goods or services related to video. 18 U.S.C. § 2710(a)(1). But the Court need not decide this issue because it agrees Plaintiff adequately alleged subscription to Defendant's video services. Specifically, she alleged *"[a]fter becoming a digital subscriber*, viewers have access to a variety of Pbs.[org]'s Video and Audio Media on Defendant's digital platform."

(Dkt. 1 ¶ 25.)  Given Plaintiff's qualifier, the Court understands this statement to allege Plaintiff's subscription and creation of a digital account gave her access to video content.  To the extent the allegation is ambiguous, the Court construes it in the light most favorable to Plaintiff. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).  If discovery reveals Plaintiff's account was wholly unrelated to Defendant's video content, the Court will re-visit this issue on summary judgment.

## B.  Whether Defendant Disclosed Plaintiff's Personally Identifiable Information

The VPPA regulates the disclosure of "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  *Ellis*, 803 F.3d at 1253; 18 U.S.C. § 2710(a)(3).  Defendant argues Plaintiff does not allege Defendant itself (1) disclosed Plaintiff's Facebook ID and (2) disclosed information identifying video materials "requested or obtained" by Plaintiff.  (Dkt. 12-1 at 14.)  The Court disagrees.

### 1.   Who Disclosed Plaintiff's Information

Plaintiff alleges that, when she and other subscribers logged into Pbs.org, Defendant sent Facebook her personally identifiable information.  (Dkt. 1 at ¶ 32.)  More specifically, she says that, when a Facebook user with a personally identifiable FID cookie (referred to by the parties as the "c_user cookie") on his or her browser visits the Pbs.org website, Defendant's "purposeful use" of the Facebook tracking pixel causes Defendant to send her personally identifiable information back to Facebook.  (Dkt. 1 at ¶ 33.)  Defendant challenges this assertion and argues Plaintiff herself causes this to happen by remaining logged into Facebook when she visits Defendant's website.  Defendant claims the Facebook c_user cookie gets "deposited" on Plaintiff's browser when she "interact[s] with Facebook before navigating" to Pbs.org and that, if she elects to remain logged into Facebook when she navigates away from that website, the cookie remains on her browser.  (Dkt. 12-1 at 10.)  So, Defendant claims "[a]t most, Plaintiff's allegations point to a communication between Facebook and the cookie placed on Plaintiff's browser when she logged into Facebook—not to any disclosure by PBS of her information to Facebook."  (Dkt. 12-1 at 15.)

13

The Court is unpersuaded.  At the motion to dismiss stage, the Court must accept Plaintiff's allegations as true.  Plaintiff clearly alleges Defendant, through the Facebook pixel, sent Plaintiff's FID and the URLs of the videos she watched to Facebook.  (Dkt. 1 ¶¶ 5, 32.) Defendant's factual arguments are not a proper basis for a motion to dismiss.  If discovery reveals Defendant played no role in the transmission of Plaintiff's information to Facebook, the Court will consider that at summary judgment.  *See Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810 at * 4 (S.D.N.Y. Nov. 17, 2022) (allegation defendant programmed website to include Facebook tracking pixel sufficient to allege defendant disclosed information); *Belozerov v. Gannett Co.*, 2022 WL 17832185 at *4 (D. Mass. Dec. 20, 2022) (same).

But Defendant's argument reveals a deeper flaw.  Under the VPPA, personally identifiable information is "information which *identifies a person as having requested or obtained* specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  So, it is not Plaintiff's FID—contained in the cookie—that establishes liability under the VPPA.  Rather, it is the bundling of the FID from the c_user cookie with the URLs of the videos Plaintiff watched that matters. (Dkts. 1 ¶ 37;

19 at 13.)  That bundling, according to Plaintiff, occurs on Defendant's website via the Facebook pixel.  (Dkt. 1 ¶ 32.)  And, also according to Plaintiff, Defendant installed the pixel on its website for that very purpose.  (Dkt. 1 ¶ 32.)  Without that, the cookie is irrelevant.  (Dkt. 19 at 13.)  That the pixel also requires Plaintiff to be logged into Facebook does not take away from Defendant's role in the transmission.  *See Czarnionka*, 2022 WL 17069810, at *3 (defendant's installation of pixel on its website prevents defendant from claiming transmission of information occurs independent of its action).  At most, it makes Defendant's alleged actions a cause that requires some pre-existing condition; but a cause, nonetheless.  So, the Court finds Plaintiff has sufficiently pleaded Defendant disclosed her personally identifiable information.

### 2.    "Requested" or "Obtained" Video Materials

In the complaint, Plaintiff includes an image from Defendant's website that shows a video available to users.  (Dkt. 1 ¶ 39.)  Plaintiff alleges that "once the user clicks on and watches the video in the article, Pbs.org sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook."  (Dkt.

1 ¶40.)   Plaintiff includes something identified as "HTTP signal communication" that she claims documents that transmission.  (Dkt. 1 ¶40.) Defendant says the Court should ignore this allegation because the URL embedded in the HTTP code "contradicts Plaintiff's allegation." (Dkt. 12-1 at 17.)  Without citing any factual support, Defendant alleges "the URL embedded in the complete code shows a transmittal of a URL that leads to a webpage on which both video and written information and materials can be found."  (Dkt. 12-1 at 17.)  Defendant also argues the image of the URL plaintiff included in her complaint reveals Plaintiff never actually played the video, "since the 'play' button is still visible and the timer reads 0:00/54:22." (Dkt. 12-1 at 18.)  So, Defendant claims the data it transmits to Facebook does not—as a matter of law—identify a video Plaintiff "requested or obtained."  (Dkt. 12-1 at 16.)   Finally, Defendant argues the complaint includes "only a small portion of the complete webpage brought up by the URL." (Dkt. 12-1 at 17.)  Defendant explains the complete webpage also includes both a link to the video and a written description.  It asks the Court to take judicial notice of the website. (Dkt. 12-1 at 18.)  Defendant puts all this together, arguing that from the information provided by Defendant, "Facebook had no way of

knowing if Plaintiff actually watched (or wanted to watch) the video based [on the URL]" or if Plaintiff visited the site for its non-video content.  (Dkt. 12-1 at 18.)

Rather than standing by her complaint allegations as she is entitled to do at the motion to dismiss stage, Plaintiff engages in Defendant's efforts to interpret the URL data.  Most importantly, she alleges the hyperlink for the video identified in the complaint "contains only the video title" and "does not indicate that any content aside from the video will be displayed"—facts she asks the court to find by reviewing Defendant's website, navigating to the video described in the complaint, and taking judicial notice of whatever the Court sees.  (Dkt. 19 at 18-19.) From all of this, she argues that, "by clicking on a video title, a user is clearly requesting, seeking to obtain, and expressing an interest in that specific video" rather than requesting (as Defendant alleges) anything that happens to be on the webpage.  (Dkt. 19 at 18-19.)

It is not clear whether Defendant is arguing Plaintiff must have *actually watched* the video or whether she must have *visited* the *URL for its video content*.  Either way (and as the above discussion indicates), Defendant is making a fact-based argument against application of the

17

VPPA.  Even if the Court could take judicial notice of the complete URL (as Defendant requests) or Defendant's website and resulting hyperlinks (as Defendant and Plaintiff both request), the Court could not interpret those facts to resolve the parties' factual disputes.  Whether the URL code includes the information Plaintiff alleges, whether the embedded code accesses both a video and a written description, and whether the code indicates that someone has already watched a video are all conclusions from evidence far beyond the scope of proper judicial notice.  To decide whether Defendant's use of the Facebook pixel violates the VPPA, the Court may have to resolve these questions.  But, those answers should follow discovery—when the Court will know what actually happened— rather than at the motion to dismiss stage—when the Court is being asked to locate additional facts and decide between the parties' competing interpretations of the evidence.  For now, the Court accepts Plaintiff's allegation that Defendant "sends the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID to Facebook."  (Dkt. 1 ¶ 40.)  This plainly alleges the information

Defendant transmits to Facebook identifies a video "requested or obtained" by Plaintiff.[3]

### C.    Whether Plaintiff Has Sufficiently Pleaded Scienter

The VPPA prohibits only a "knowing" disclosure.  18 U.S.C. § 2710 (b)(1).  Defendant argues Plaintiff has not pleaded the required knowledge because she has not alleged Defendant knew Plaintiff had a Facebook account or that she was using a device onto which Facebook had deposited the c_user cookie.  (Dkt. 12-1 at 20-21.)  Though not affirmatively stated in the complaint, the Court infers from Plaintiff's other allegations that she asserts Defendant's knowledge of this fact.  After all, she alleges the Facebook pixel can only transmit personally

---

[3] To the extent Defendant argues the VPPA requires Plaintiff actually watch the videos, the Court rejects that argument.  With questions of statutory interpretation, the Court begins with the text of the statute.  *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022).  The plain text of the VPPA regulates the disclosure of "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  *Ellis*, 803 F.3d at 1253; 18 U.S.C. § 2710(a)(3).  Nowhere does the VPPA require that the consumer actually watch the video.  A quote by Senator Leahy alluding to the "right to privacy [in] the choice of movies that we watch" does not expand the scope of the VPPA beyond its plain meaning.  (Dkt. 21 at 14.)  *See CSX Corp. v. United States*, 18 F.4th 672, 680 (11th Cir. 2021) (Courts "do not consider legislative history when the text is clear. ... When the words of a statute are unambiguous, ... judicial inquiry is complete.")

identifiable information when the c_user cookie is enabled and active, that is, when a user has it in his or her browser and then visits Defendant's website.  (Dkt. 1 ¶ 33.)  And she alleges Defendant did this to her.  The Court thus finds Plaintiff has adequately alleged knowledge.

Plaintiff also alleges Defendant intentionally installed the Facebook pixel on the Pbs.org website to benefit from the transmission of users' personally identifiable information.  If Defendant installed the Facebook pixel knowing it transmits that information, the knowledge element of the VPPA is satisfied.  *See Belozerov*, 2022 WL 17832185 at *4 (finding knowledge where plaintiff alleged "defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscriber's FID [and that] defendant knew that the Facebook pixel disclosed personal viewing information to Facebook."); *Czarnionka*, 2022 WL 17069810 at * 4 (finding sufficient allegation "defendant's disclosures were made knowingly, as [defendant] programmed the Facebook pixel into its website code, knowing that Facebook would receive video titles and the subscriber's FID when a subscriber watched a video.").

Defendant's argument that it can only be liable under the VPPA if it knew both that a specific plaintiff used Facebook and was logged into Facebook while using Pbs.org does not sway the Court.[4]  Again, Plaintiff alleges Defendant installed the pixel for the specific purpose of transmitting personal viewing information whenever possible and in an automated manner.  No more precise knowledge is required under the statute.  Perhaps Defendant's intentionality will look different after discovery.  But, at this point, Plaintiff's allegations are sufficient to allege Defendant acted with the requisite state of mind.

## IV.  Conclusion

The Court **DENIES** Defendant's Motion to Dismiss (Dkt. 12) and **GRANTS** Defendant's motions for leave to file and respond to notices of supplemental authority (Dkts. 23, 27, 29, 30).  The Court **DENIES AS MOOT** Defendant's Motion to Disregard Plaintiff's Response (Dkt. 33).

---

[4] Defendant argues the test for knowledge is subjective: "[P]laintiff must prove that the video-service provider actually knew that it was disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two—i.e., that the given user had 'requested or obtained' the given video material." (Dkt. 12-1 at 19-29 (citing *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015)).  While *Hulu* is not binding precedent on this Court, nothing in this test suggests Defendant must have been aware of each individual user's Facebook status.

**SO ORDERED** this 20th day of March, 2023.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE